**Exhibit 5**

FCLALOLHps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DAVID LOLA, GERALD RUSH, and
    LISA LEWIS,
4
                Plaintiffs,
5
            v.                          13-cv-5008 (RJS)
6
    SKADDEN, ARPS, MEAGHER, SLATE &
7   FLOM LLP, et al.,

8               Defendants.

9   ------------------------------x

10                                      New York, N.Y.
                                        December 21, 2015
11                                      2:30 p.m.

12
    Before:
13
                        HON. RICHARD J. SULLIVAN
14
                                        District Judge
15

16                      APPEARANCES

17  JOSEPH, HERZFELD, HESTER & KIRSCHENBAUM
        Attorneys for Plaintiffs
18  BY:  DANIEL M. KIRSCHENBAUM, ESQ.
        DENISE A. SCHULMAN, ESQ. (via speakerphone)
19
    OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
20      Attorneys for Defendants
    BY:  BRIAN J. GERSHENGORN, ESQ.
21      STEPHANIE L. ARANYOS, ESQ.

22
    Also Present (via speakerphone): David Lola
23                                   Gerald Rush
                                     Lisa Lewis
24

25

1                (In open court)

2                THE CLERK:  13 Civil 5008, Lola v. Skadden, Arps,

3        Meagher, Slate & Flom, et al.

4                THE COURT:  Have a seat.  Let me take appearances.

5        For the plaintiffs?

6                MR. KIRSCHENBAUM:  Good afternoon, your Honor.  Marvin

7        Kirschenbaum for the plaintiffs.

8                THE COURT:  Ms. Kirschenbaum and Mrs. Schulman, good

9        afternoon.  The plaintiffs are on the phone; is that right?

10               MR. KIRSCHENBAUM:  Yes.

11               THE COURT:  We've got them muted for now, but let me

12       just make sure they're on the line.

13               OK.  So Mr. Lola, are you on the line?

14               Mr. Lola?

15               MR. LOLA:  David Lola, your Honor?

16               THE COURT:  Yes.  Can you hear me OK?

17               MR. LOLA:  Yes, your Honor.

18               THE COURT:  Good.  OK.  And then Mr. Rush, are you on

19       the line?

20               MR. RUSH:  I am on the phone.  Thank you, your Honor.

21               THE COURT:  Good.  And you can hear me all right also?

22               MR. RUSH:  Yes, I can.

23               THE COURT:  Good.  And then finally, Ms. Lewis?

24               MS. LEWIS:  Yes.  I'm on the line as well, your Honor.

25               THE COURT:  And you can hear me OK.  Is that right?

1          MS. LEWIS:  Yes.

2          THE COURT:  Good.  So hopefully the technology will

3     hold out.  We're here for a fairness hearing, which I'll

4     explain in a moment.  If at any point you have difficulty

5     understanding or hearing what's going on, let me know.

6          Right now what I'm going to do is also take the

7     appearances of the defendant, or the defendant's counsel.  So

8     if you could state your name for the record.

9          MR. GERSHENGORN:  Good afternoon, your Honor.  Brian

10    Gershengorn and Stephanie Aranyos from Ogletree Deakins for the

11    defendants.

12         THE COURT:  Good.  Mr. Gershengorn, good afternoon,

13    and Ms. Aranyos, good afternoon to you.

14         So as I said, we are here for a fairness hearing.  In

15    cases involving the Fair Labor Standards Act, courts are

16    required before approving a settlement to make sure that it's a

17    fair and reasonable settlement.  And that's because there's a

18    concern that employees might be at a disadvantage relative to

19    employers, and so that lack of leverage might induce them to

20    take less than what they're entitled to under the law.  And so

21    a body of law has developed which indicates that judges like me

22    should inquire and ascertain whether or not this is a fair and

23    reasonable settlement, in light of all the considerations,

24    which I'll talk about in a moment.

25         The focus is really on its fairness from the

1   perspective of the plaintiffs.  The law doesn't really care

2   much about the defendants.  I don't mean it to sound callous.

3   It's just that the presumption is that the employers if

4   anything have more leverage and therefore we trust that they

5   will be able to do what's in their own interest.  We're a

6   little more solicitous towards plaintiffs.

7          Most cases, I should note, involving settlements,

8   don't get courts involved.  Relatively few cases have court

9   involvement in ascertaining the fairness of a settlement.  So

10  this is a narrow range of cases where courts get so involved.

11         Let me hear from Mr. Kirschenbaum the terms of the

12  settlement.  I received a letter from the parties, a joint

13  letter, and a copy of the settlement agreement.  But it doesn't

14  specify all the details of the settlement.  And so, as I

15  mentioned during settlement conference, I want to put that on

16  the record now.  I want to make sure that the plaintiffs know

17  what the settlement terms are and that they are comfortable

18  with it.  OK.  Mr. Kirschenbaum?

19         MR. KIRSCHENBAUM:  I think the most important term of

20  the settlement is not actually set forth in the settlement

21  except that, in the settlement agreement, it is clear that

22  defendants will agree to pay the total $75,000 amount as

23  recited at this hearing and consistent with previous

24  correspondence between me and defendants' counsel.  And these

25  numbers have been reviewed by plaintiffs prior to the hearing.

1          THE COURT:  Right.

2          MR. KIRSCHENBAUM:  Essentially Mr. Lola will receive

3    $7,689.25 on a W-2 and $7,310.75 on a 1099.  Ms. Lewis will

4    receive $7,527.13 on a W-2 and $2,483.95 on a 1099.  Mr. Rush

5    will receive $8,725.88 on a W-2, $2,879.54 on a 1099.

6          The attorney's fees, payable directly to my firm,

7    would be $38,383.50.

8          The nature of the breakdown as discussed with your

9    Honor but slightly tinkered with since the settlement

10   conference was, for Mr. Rush, Mr. Rush and Ms. Lewis will each

11   be receiving the full amount of overtime that they would be

12   paid, they would be owed had they prevailed on their claims in

13   this lawsuit, plus 33 percent of the full liquidated damages

14   amount that they would recover if they were able to prevail on

15   a claim for liquidated damages.

16         Mr. Lola will be receiving also the full amount of

17   money that he would have received if he had prevailed on all

18   the claims of this lawsuit.  But he will be getting more than

19   33 percent of the liquidated, the differential between what

20   he's actually getting and, say, 133 percent of his base damages

21   are attributed to the fact that he was the pioneer, if you

22   will, of this lawsuit, who got an extra, a little less than

23   $5,000.

24         THE COURT:  Right.  But I thought the plan was to

25   treat liquidated damages the same across all three and then to

FCLALOLHps

1    have in essence a litigation bonus for Mr. Lola since he is the

2    one who initiated the case and did the heavy lifting early on.

3    And that's not unusual in cases of this sort.

4              MR. KIRSCHENBAUM:  And that's what it is, your Honor.

5              THE COURT:  OK.  So each is getting the full

6    compensatory damages that they would be owed if they prevailed

7    across the board on their wage and hour claims, the

8    compensatory, and plus 33 percent of the liquidated damages

9    amount, which is 33 percent of the compensatory.

10             MR. KIRSCHENBAUM:  Right.

11             THE COURT:  And then Mr. Lola is getting an additional

12   kicker, so to speak, of how much?

13             MR. KIRSCHENBAUM:  It's close to $5,000.  Essentially

14   it just breaks his number up to $15,000 from like 10 and

15   change.  I didn't break it out completely separately because

16   all of that money is being paid to him on a 1099.

17             THE COURT:  And what's the significance of that?

18             MR. KIRSCHENBAUM:  Well, any money that's not

19   compensatory damages are payable on a 1099.  So his base

20   overtime amount is $7,689.25.  33 percent of the liquidated

21   is -- I could do the math here -- it's about 2500 plus 63 --

22   about $2563 and about 8 cents, if my -- which would get him up

23   to about $10,200.  So the added 4800, if you will, is the bonus

24   for being the named plaintiff.

25             THE COURT:  All right.  And the attorney's fees, as

FCLALOLHps

1    you said, were $38,383.50.  In your letter you indicated that's

2    below, it's approximately 50 percent, or a little more than 50

3    percent of the attorney's fees on an hourly basis.

4              MR. KIRSCHENBAUM:  That's right, your Honor.

5              THE COURT:  And what's the rate that you and

6    Ms. Schulman and others charge?

7              MR. KIRSCHENBAUM:  That would be using the two primary

8    timekeepers, I would say, that account for 99 percent or more

9    of the time were me and Ms. Schulman.  The rate for me is $450

10   and the rate for Ms. Schulman is 300, which is previously

11   approved in this district.

12             THE COURT:  Yes.  I think that's fair.

13             All right.  So let me just start with each of -- I'm

14   going to start with each of the plaintiffs.  So you've heard

15   the numbers that Mr. Kirschenbaum just recited.  Let me make

16   sure you did hear that.  Mr. Lola, you heard what

17   Mr. Kirschenbaum said?

18             Are we on mute?

19             Mr. Lola?

20             MR. KIRSCHENBAUM:  It sounds like we're on mute,

21   because Mr. Lola had some background noise.

22             THE CLERK:  No, you're not.

23             MR. LOLA:  Yes, your Honor.

24             THE COURT:  That's not the first time you're hearing

25   the numbers.

1          MR. LOLA:  I heard the numbers, your Honor.  I muted

2     my phone.

3          THE COURT:  All right.  Fair enough.

4          Mr. Rush, you heard the breakdown as it pertains to

5     you; is that correct?

6          MR. RUSH:  Yes, I did, your Honor.  That is correct.

7          THE COURT:  And you've discussed this before with

8     Ms. Kirschenbaum or Ms. Schulman, correct?

9          MR. RUSH:  Yes, I did.

10          THE COURT:  All right.  And then finally with respect

11     to Ms. Lewis, you've also heard the numbers that were recited

12     by Mr. Kirschenbaum?

13          MS. LEWIS:  Yes.  And we -- he and I reviewed them

14     prior to this hearing as well, your Honor.

15          THE COURT:  OK, good.  So I want to make sure it's not

16     news to you.  And you also heard the number of attorney's fees,

17     right?  And you're all comfortable with that.

18          MS. LEWIS:  Yes.

19          MR. RUSH:  Yes, your Honor.

20          THE COURT:  All right.  So in order to determine

21     whether this is a fair settlement, I have to consider several

22     things, the first of which, I guess, is whether or not this

23     settlement is the result of an arm's-length negotiation, which

24     I think clearly it is.  This is a case that's lasted a while.

25     It went all the way up to the circuit before coming back to me.

1    Both sets of lawyers are very good at what they do, and I have

2    no reason to think that they did anything other than really

3    fight this case zealously.  And I use the word "fight" in a

4    positive sense.  They each represented their clients zealously

5    and hard and tried to get the best resolution that they thought

6    they could get.  So I certainly think it's been the result of

7    an arm's-length negotiation.

8        Another consideration is whether this is fair

9    substantively, as opposed to procedurally.  In other words, is

10   this a fair settlement?  That's a hard thing to say sort of in

11   the abstract.  Every settlement turns on the specifics.  And so

12   I have to consider how this settlement relates to what the case

13   would look like, what the resolution would be if the case had

14   gone completely the plaintiffs' way at trial.  I have to then

15   consider the potential for litigation risk, in other words, the

16   potential that the plaintiffs could lose this case, which I

17   guess they kind of did in front of me the first time, before it

18   came back down.

19       I have to consider the effect of the time value of the

20   money involved.  A litigation can take a long time.  It can be

21   costly.  It can require some up-front costs.  There can be a

22   lot of delay involved for people who perhaps want to get paid

23   sooner rather than later.

24       I have to consider the solvency of defendants, which I

25   don't think is really an issue here, though sometimes it is and

FCLALOLHps

1   has to be considered.  The prospect of a settlement now as

2   opposed to a victory but little ability to collect later, these

3   are all legitimate considerations.

4          And so let's, I guess sort of considering those

5   things, let me ask each of the plaintiffs, are they comfortable

6   with this settlement?  Do you think this is a fair settlement?

7   Mr. Lola, I'll start with you.

8          MR. LOLA:  Yes, your Honor.  I believe it's a fair

9   settlement.

10          THE COURT:  And you've thought about all these factors

11   that I just mentioned?

12          MR. LOLA:  Yes, your Honor.

13          THE COURT:  All right.

14          Mr. Rush, I'll ask you the same question.  Again, a

15   fair settlement is not necessarily the best possible settlement

16   but a fair settlement in light of all the different

17   considerations.  What do you think?

18          MR. RUSH:  I think it's fair, your Honor, yeah.

19          THE COURT:  All right.  And then finally, Ms. Lewis,

20   do you have any thoughts with respect to the fairness of the

21   settlement?

22          MS. LEWIS:  I think it's a fair settlement, all things

23   considered, your Honor.  Thank you.

24          THE COURT:  OK.  In terms of the money, I agree, I

25   think that this is a case that I had originally dismissed.  I

1    think there is a least a significant risk that after discovery

2    and either summary judgment motions or a trial, that there is

3    at least a potential that there would be no recovery.  And

4    that's not an insubstantial risk.  I think it was a very real

5    risk.

6              In terms of the best possible settlement, according to

7    the lawyers and what's been represented to me, this is a

8    hundred cents on the dollar in terms of the overtime wages.

9              Now, if the plaintiffs could demonstrate that the

10   violations were willful, this was a willful violation of the

11   federal Fair Labor Standards Act, then there would be an

12   entitlement to liquidated damages that would double those

13   compensatory damages, but I think willfulness here, as

14   suggested in the letter from counsel, was certainly not a

15   slam-dunk.  I think it was really an issue of first impression.

16   No court in this district has resolved an issue involving

17   lawyers like this one.  I guess there is a case kicking in

18   front of Judge Abrams, but she hasn't ruled yet on summary

19   judgment.  So I think this is one where there might have been

20   good arguments as to why, even if the reliability liquidated

21   damages might not be appropriate.

22             So it seems to me an award that includes a hundred

23   cents on the dollar for the overtime, in terms of compensatory,

24   and 33 cents on the dollar for liquidated damages, is a pretty

25   good settlement, dollar-wise.

1          Often court are approving settlements in which the

2     attorney's fees are coming out of the plaintiff's share of the

3     settlement.  That's not the case here.  Plaintiffs are getting

4     their money clear before the lawyers collect a nickel.  So that

5     strikes me as fair in terms of the dollars.

6          One issue that I think we should discuss is that the

7     settlement agreement has two provisions which have been not

8     uniformly accepted in this district.  And that relates to two

9     things.  One is a requirement of confidentiality, in essence a

10    sort of a gag order that prohibits the parties, particularly

11    the plaintiffs, from really discussing this case, other than to

12    say that the case was resolved.  It's a very broad

13    confidentiality provision of the sort that other judges in this

14    court have rejected.

15         In addition, there is a very broad waiver of rights

16    provision that basically says that plaintiffs agree to forgo

17    and resolve any and all claims that they may have against the

18    defendants, including claims known or unknown, which is very

19    broad and some courts have certainly balked at that.  So I may

20    ask the lawyers, or maybe Mr. Kirschenbaum or Ms. Schulman, to

21    talk about that.  We discussed this a little bit at the

22    settlement conference.  But there is certainly some case law

23    that goes the other way on this.  And I'm not aware of any

24    written opinions that have approved a settlement including

25    terms like this, which is not to say that courts haven't

1 approved broad confidentiality and waiver provisions. But

2 there has been no written opinion expressly addressing this

3 that I'm aware of in this district.

4 So, Mr. Kirschenbaum, first of all, are you aware of

5 any other cases that sort of affirm or approve a settlement

6 that includes such broad waiver and confidentiality provisions?

7 MR. KIRSCHENBAUM: There is a decision recently by

8 Judge Cott --

9 THE COURT: You're right. Judge Cott declined to

10 approve the broad waiver provision but accepted the -- no, vice

11 versa -- accepted the broad waiver provision on the facts

12 before him but didn't accept the broad confidentiality

13 provision. The other cases, other than the Judge Pauley, seems

14 to be in these otherwise. But he's not alone. Judge Kaplan

15 has one and I guess there are a couple of others. So I don't

16 care which order you take them, but do you have a preference?

17 MR. KIRSCHENBAUM: Yes. I will start with the waiver

18 issue. I don't know specifically of a case that rejects

19 general release where the general release is mutual, in other

20 words, where the plaintiffs are releasing all claims against

21 the defendants and the defendants in turn release any claims

22 against the plaintiffs.

23 THE COURT: Are there any claims against the

24 plaintiffs? There are no counterclaims in this case, right?

25 MR. KIRSCHENBAUM: There are no counterclaims, and the

1    same way that there are no other claims asserted by the

2    plaintiffs against the defendants, there are no claims

3    asserted -- there are no other live claims, in either

4    direction.  The nature of the release is simply very clearly a

5    quid pro quo release of claims from one side to the other.

6         I will note that the release is typically something

7    that is more of a sticking point for the defendants in exchange

8    for the favorable settlement.  Here the plaintiffs were willing

9    to agree to it.  My understanding of the law is that this is

10   acceptable, in light of its mutual nature, especially in light

11   of Judge Cott's opinion.  I am not aware of any court that

12   deals specifically with the issue of a release that is mutual

13   and rejected.

14        I think that that might be called added consideration

15   too.

16        With respect to the nondisclosure, your Honor refers

17   to it as a broad nondisclosure.  I think it's at least a little

18   less broad than many of the confidentiality agreements that I

19   have seen rejected.  The first and foremost and primary

20   confidentiality terms are a restriction on plaintiffs' counsel

21   as opposed to plaintiffs themselves.  The plaintiffs

22   themselves, it seems to me that the main restriction on them is

23   contacting media or using social media regarding this

24   settlement.

25        Now, again, your Honor, I don't have a strong feeling

1    about how this should go, other than this is what defendants

2    wanted as part of the settlement and my clients agreed to it in

3    exchange for consideration.  I think that I'll defer to

4    whatever defendants' position is with respect to the

5    public-policy ramifications of it.  We did have some sort of

6    session prior to -- during the settlement conference to try and

7    get a sense of what your Honor's position was on it, though

8    admittedly your Honor certainly preferred this fairness hearing

9    to make the ultimate decision.

10           I don't think it's that broad, and, unlike the

11   specific examples mentioned in the Cheeks decision in the

12   Second Circuit, does not contain a liquidated damages provision

13   if it's violated.  So it's not particularly troublesome to me

14   as plaintiff's counsel.  But, again, I would defer to

15   defendants' arguments with respect to the public-policy

16   ramifications of it.

17           THE COURT:  Do defendants wish to speak to the

18   public-policy arguments?

19           MR. GERSHENGORN:  I think, your Honor, we would agree

20   certainly on the waiver issue.  Magistrate Judge Francis has a

21   recent, November 5, 2015 decision in the Suarez matter going to

22   the mutuality of the release, and since it is mutual release

23   based upon mutuality, at least in that very short opinion,

24   Magistrate Judge Francis says he agreed with the settlement

25   based upon mutuality of release.

1          In regards to the confidentiality provision, we do

2     think that it's certainly different than the case law that's

3     put forward.  We think Cheeks is distinguishable because the

4     other factors that are also encompassed within Cheeks are not

5     present here, plaintiffs' counsel getting between 43 and 43.6

6     percent of the total settlement payment.  We don't have the

7     broad language of the confidentiality provisions that were

8     spoken about in Cheeks.

9          We also think, like Mr. Kirschenbaum said, the vast

10    majority of limitations are on plaintiffs' counsel here, less

11    so on plaintiffs themselves.  Plus, from a policy perspective,

12    these are licensed attorneys that are represented by the

13    certainly capable counsel, Mr. Kirschenbaum here.  And we don't

14    deem this to be a particularly offensive provision within the

15    settlement agreement.

16          THE COURT:  All right.  Thanks.

17          Let me just make sure that the plaintiffs understand

18    what we're talking about.  Do each of you understand that there

19    is a provision -- it's a nonmonetary provision in this

20    settlement agreement -- that says that there are restrictions

21    on what you and your lawyers can say about this settlement and

22    how you can say it?  And then there also is a broad waiver of

23    other claims; you waive any claims against the defendants,

24    including claims you may not know about right now, and they

25    waive any claims they may have against you, against also

FCLALOLHps

1   including unknown causes of action or causes of action unknown

2   as of this time.  So pretty broad going both ways.  So that's

3   what the lawyers are talking about when they say it was a

4   mutual or is a mutual waiver provision.

5        So each of you understand that?  Mr. Lola?

6        MR. LOLA:  Yes, your Honor.  I understand that.

7        THE COURT:  And you are comfortable with it?

8        You're comfortable with that, Mr. Lola?

9        Mr. Lola, are you comfortable with those provisions in

10  the agreement?  I just want to make sure you're aware of them

11  and you're OK with them.

12       MR. LOLA:  Sorry, your Honor.  Could you repeat the

13  question for me?

14       THE COURT:  Sure.  You told me you're aware of those

15  provisions.  And you're comfortable with them, as being fair

16  and consistent with a fair settlement?

17       MR. LOLA:  Yes, your Honor.

18       THE COURT:  OK.

19       Mr. Rush, same question to you.

20       MR. RUSH:  Yes.  I'm aware of the provisions and it's

21  fair enough.

22       THE COURT:  OK.  You're comfortable with it.

23       MR. RUSH:  Yeah.

24       THE COURT:  All right.  And then finally, Ms. Lewis?

25       MS. LEWIS:  Yes, your Honor, I'm aware of the

1    provision, and in light of the full settlement I am comfortable

2    with them.

3              THE COURT:  All right.  I'm comfortable with them too.

4    I will say, I'm not aware of anything in the Fair Labor

5    Standards Act or in the case law surrounding it that would

6    suggest that there should be a per se prohibition on a broad

7    waiver provision, mutual or even nonmutual, or of a

8    confidentiality provision or a gag provision.  It seems to me

9    that the Court should be assessing every settlement on its own

10   terms and assessing whether it's fair.  And just as plaintiffs

11   are free and courts are frequently known to approve settlements

12   that are for less than a hundred cents on the dollar, in light

13   of various considerations including risk, it seems to me that

14   plaintiffs should also be free to negotiate other nonmonetary

15   interests in pursuit of the final settlement.  And so I think

16   that -- I guess that's a starting point for me.

17             In terms of the confidentiality or the gag provision,

18   since the plaintiffs would be free not to discuss these things

19   if they wanted to prospectively, they would be free not to

20   answer questions from certain sources if they chose not to.  I

21   don't see why on earth they wouldn't be entitled to, in

22   advance, say, we will not do those things, as part of a

23   settlement.  I don't think that that's unconscionable or

24   against public policy, at least not in all circumstances, and

25   certainly not in this settlement, in the context of this

1    settlement.

2           Similarly, with respect to the waiver of claims, I

3    think it's certainly possible to imagine a scenario where that

4    might be against public policy or might be improper and thereby

5    render a particular settlement unfair or unreasonable.  I don't

6    think that's a per se truth.  And I don't think, in the context

7    of this settlement, that there is anything improper about the

8    very broad waiver language that affects both parties, the

9    defendants and the plaintiffs, in order to have a complete and

10   total settlement that resolves all outstanding claims and puts

11   this thing to bed.  I think that's not uncommon in litigation

12   of all kinds.  And I think it is clearly desirable in many Fair

13   Labor Standards Act claims.

14          So I can't say that this settlement, considered as a

15   whole, with all its various parts, is unfair.  And so therefore

16   I am, unlike perhaps some of my colleagues, who seem to have

17   adopted what appear to be per se rules, I refuse to do that,

18   and I think this is, as written, a fair settlement, in light of

19   all the considerations that we've talked about and that there

20   are also discussed in case law.

21          So let me now turn to the attorney's fees.  The

22   attorney's fees are a little over $38,000.  I guess it's all

23   relative.  That sounds like a lot of money to some folks and

24   for other folks it sounds like a pittance.  I think certainly

25   that, in terms of the hours worked and in terms of the fees,

1    that are reasonable fees, I think Mr. Kirschenbaum and

2    Ms. Schulman and their firm are the best in breed -- of firms

3    doing this kind of work.  There are a lot of good ones, but I

4    think this is as good as any.  And I'm not stroking them.  I

5    really do believe that and I've said it before.  So I think the

6    rates that they charge per hour are not crazy.  I think they're

7    justified.

8        I think the number of hours worked also strike me as

9    appropriate.  This case took a lot of work.  It went all the

10   way up to the Second Circuit, where they won.  And then it came

11   back down.

12       So I think these fees, on balance, in consideration of

13   all the different factors that a court is asked to consider, in

14   assessing the reasonableness of attorney's fees, they strike me

15   as very fair and well earned.

16       So I have no problem with the attorney's fees.  It

17   sounds like the plaintiffs don't either.  So I will approve the

18   attorney's fees component of this settlement as well.

19       OK.  So what I propose to do, then, is to issue an

20   order that are just says that I have approved the settlement

21   for the reasons stated on the record.  I guess I will decide

22   whether I want to write to just sort of add my two cents to the

23   growing body of law with respect to waivers of claims and

24   confidentiality.  So I may do that, but maybe I'll do that in a

25   separate opinion to follow just so everybody gets an order that

FCLALOLHps

1    says I have approved the settlement.

2            Is there anything else we should cover today?  Let me

3    just first ask the lawyers.  Mr. Kirschenbaum or Ms. Schulman?

4            MR. KIRSCHENBAUM:  Nothing here, your Honor.

5            THE COURT:  OK.

6            MR. GERSHENGORN:  Nothing from the defense, your

7    Honor.

8            THE COURT:  Plaintiffs, let me just ask any of you, is

9    there anything else you would like to say before I bid you

10   farewell and I wish you good luck?

11           MS. LEWIS:  No, your Honor, not here.

12           THE COURT:  OK.

13           MR. RUSH:  No.  Mr. Rush speaking.  No.

14           THE COURT:  And Mr. Lola, you get the last word.

15           MR. LOLA:  No, your Honor.

16           THE COURT:  All right.  Well, I think it is a fair

17   settlement for the reasons I said.  I wish everyone the

18   happiest of holidays and a happy new year, and good luck in all

19   your future endeavors.

20           Let me thank the court reporter.  If anybody would

21   like a copy of this transcript, you can take that up through

22   the court reporter either right after this proceeding or

23   separately through the website.

24           Thank you very much.

25                               o0o